89 357
108 209

THE FIRST NATIONAL BANK OF MARQUETTE ET AL. V.
ALFRED WEED ET AL.

*Chattel mortgage—Non-resident mortgagor—Place of filing—Lien
—Bill of sale—Subrogation.*

1. Under How Stat. § 6193, which requires chattel mortgages executed by non-residents of this State to be filed in the office of the clerk of the township "where the property is," such filing must be in the township where the property is situate at the time of the execution of the mortgage.

2. A chattel mortgage was executed upon a quantity of saw-logs to secure the payment of accommodation notes given by the mortgagees to enable the mortgagors to cut the logs and manufacture them into lumber, under an agreement on the part of the mortgagors to pay the notes out of the proceeds arising from the sale by them of said lumber. And it is held that purchasers of the lumber could hold it as against the mortgagees, or the holders of the notes, who claimed to be subrogated to the rights of the mortgagees.

3. The Court find that a bill of sale, absolute in form, was intended by the parties to operate as a chattel mortgage.

Appeal from Gogebic. (Williams, J.) Argued November 19 and 20, 1891. Decided December 22, 1891.

Bill to foreclose a chattel mortgage, for the appointment of a receiver, etc. Both parties appeal. Decree modified and affirmed. The facts are stated in the opinion.

*J. E. Ball* (*Ball & Hanscom,* of counsel), for complainants.

*Flower, Smith & Musgrave, C. F. Button,* and *Benton Hanchett,* for defendant the South Branch Lumber Company.

*Tomkins, Merrill & Smith,* for defendant the First National Bank of Ashland.

LONG, J. The bill in this cause was filed for the purpose of declaring a certain bill of sale, given by A. Weed & Co. to Hoxie & Mellor, a chattel mortgage as security for certain accommodation paper made and indorsed by Hoxie & Mellor, and used by A. Weed & Co. in their business, and to decree the same to be a lien upon the logs described in said bill of sale, and the lumber and other material manufactured therefrom, and that the same be declared a trust fund for the payment of such accommodation paper; to declare the articles of agreement or sale by said A. Weed & Co. to the South Branch Lumber Company null and void as against said bill of sale given to Hoxie & Mellor; that the bill of sale be decreed to be a lien upon said property in the nature of a chattel mortgage prior to the purchase of the said South Branch Lumber Company; that a certain chattel mortgage held by the First National Bank of Ashland, Wis., be declared to be a lien subsequent to the lien of the complainants upon said property; and that the accommodation paper held by the complainants be first paid out of the proceeds realized from the sale of the logs.

The bill asked for an injunction against defendants restraining them from interferring with, removing, or disposing of the logs, lumber, lath, shingles, or timber, and for the appointment of a receiver. Upon the hearing in the court below, a decree was made from which complainants and several of the defendants appeal.

On November 28, 1889, A. Weed & Co., composed of Alfred Weed and Paul Weed, who were engaged in the business of getting out logs, manufacturing them into lumber, and selling the lumber, made with Hoxie & Mellor the following contract:

"ANTIGO, WIS., Nov. 28, 1889.

"This agreement witnesseth that Hoxie & Mellor, in

consideration of two promissory notes of A. Weed & Co., for $2,500 each, dated to-day, one due July 15 next, and one due October 15 next, without interest, hereby agree to advance to A. Weed & Co. their notes for such amounts and at such times as will be necessary to carry on A. Weed & Co.'s business at Ramsay, and for the purpose of logging a certain four million tract at Ashland. Hoxie & Mellor also agree to indorse A. Weed & Co.'s notes for $14,000, for payment of purchase price of above four million feet of timber. It is agreed between both parties that the amount of notes advanced for Ramsay business shall not exceed $70,000 in all at any one time, and that the amount advanced for Ashland business shall not exceed $30,000 in all at any one time, including the indorsement of $14,000 for purchase price of timber. A. Weed & Co. agree to use Hoxie & Mellor paper at such places as will not interfere with the conducting of their (Hoxie & Mellor's) other business, and also agree that all notes shall be taken up by them before Dec. 31, 1890, out of the proceeds of sales of stock.

"Hoxie & Mellor.
"A. Weed & Co."

Under this contract notes were advanced by Hoxie & Mellor to A. Weed & Co., and renewals of such notes were made by Hoxie & Mellor, up to April 5, 1890, amounting to $108,000.

On March 30, 1890, Paul Weed, who acted for A. Weed & Co., wrote to Mellor, who acted for Hoxie & Mellor, the following letter:

"Ashland, Wis., March 30, 1890.
"Mr. E. W. Mellor,
"Antigo, Wis.
"Dear Sir:

"We inclose the last $3,500 note for signature and return, as per my letter of recent date. We finish the last of our logging operations on April 2, and they have been very satisfactory. As fast as we market our lumber we shall retire the notes out, but that will not begin until June or July. We have arrangements to take care of our renewals in the mean time. I did not see Bishop but a few minutes, owing to a mistake, and we having a

lawsuit on our hands the following day. Did he take the logs?

"Yours truly,
"PAUL WEED."

To this letter Mellor replied by letter of April 5, as follows:

"ANTIGO, WIS., April 5, 1890.

"PAUL WEED,
    "Ashland, Wis.
"Dear Sir:
    "Your favor of the 30th ult. came while I was away; hence the delay in replying. I return the note herewith, as it is impossible for me to sign it under existing circumstances. Will explain more fully when I see you. Expected to see you ere this, and, if you are not coming down soon, let me know, and I will go up there, as I must see you ere long. I inclose you also your note which was renewed.

"Yours truly,
"E. N. MELLOR."

After receiving this letter, Paul Weed went to see Mellor at Antigo, and there executed to Hoxie & Mellor the bill of sale which complainants, by their bill, claim was intended as security for certain notes indorsed, and thereafter to be indorsed, by Hoxie & Mellor. This bill of sale is as follows:

"Know all men by these presents, that A. Weed & Co., of Ramsay, Gogebic county, Michigan, of the first part, for and in consideration of the sum of seventy thousand dollars, lawful money of the United States, to me in hand paid, at or before the ensealing and delivery of these presents, by Hoxie & Mellor, of the second part, the receipt whereof is hereby acknowledged, have bargained, sold, granted, and conveyed, and by these presents do bargain, sell, grant, and convey, unto the said parties of the second part, their executors, administrators, and assigns, twenty-eight thousand pine saw-logs, scaling seven million feet, more or less. Said logs are now lying and being in the Black river, near Ramsay, Gogebic county, Michigan.

"*To have and to hold the same* unto the said parties of the second part, their executors, administrators, and assigns, forever. And we do, for our heirs, executors, administrators, and assigns, covenant and agree, to and with the said parties of the second part, to warrant and defend the same described goods, hereby sold unto the said parties of the second part, their executors, administrators, and assigns, against all and every person and persons, whomsoever.

"*In witness whereof* we have hereunto set our hands and seals the fifteenth day of April, A. D. 1890.

"A. WEED & Co. [Seal.]

"Signed, sealed, and delivered in the presence of

"GEORGE R. FRASER."

When this bill of sale was made the logs were where they had been banked. The driving of them had not commenced, and A. Weed & Co.'s men were on the ground preparing for the drive. They continued the work, and drove the logs. The drive started about the 17th of April, and was finished about the 4th of May. A. Weed & Co. began sawing the logs about May 5, and continued sawing them until some time in September, when all the logs in controversy had been sawed. The bill of sale before set out was not filed until the 10th day of May, 1890. On the 11th of June following, A. Weed & Co. made a contract of sale to the South Branch Lumber Company of all the merchantable white pine lumber which had then been sawed from the logs, and all which they should saw from the logs, as follows:

"CHICAGO, ILL., June 11, 1890.

"SOUTH BRANCH LUMBER COMPANY,

"Chicago, Ill.:

"We will sell you all the merchantable white pine lumber now piled at our mill at Ramsay; also the lumber from logs now in Black river and tributaries, and to be sawed at our mill in Ramsay,—the entire cut being about seven million feet,—for the sum of $14 per M ft., board measure, f. o. b. cars at our mill. The 10 ft. c. and better to go in at the same price, and the 6 and 8 ft. c. and better at $10 per M feet. The mill culls,

and 6, 8, and 10 ft. common and poorer, are not a parcel of this agreement. The lumber to be all cross-piled, and grades kept separate, as directed by you. We will also sell you our extra star shingles at $1.75, and the 6 dimension clear shingles at $2.20, per M, f. o. b. cars at Ramsay. Lumber to be settled for on the basis of $13 per M on McClintock's estimate, the first of each month, and you to give us your ninety-day paper for the same. The lumber to be manufactured from time to time as directed by you or your representative; and we shall take proper care in piling and covering same to prevent staining, and see that no lumber is piled nearer than 150 ft. of the mill, to protect you in insurance. When estimates are taken each pile to be marked, 'The property of the South Branch Lumber Company.'

"We also agree to make good to you any expense or loss that you may be put to by any claims or otherwise made against this lumber by other parties. Final settlement to be made as per the price of $14 on the completement of the shipment of all the lumber. Lumber to be inspected by C. M. E. McClintock, each paying one-half of the same.

"We also agree to hold this lumber in piles until reduced in weight not to exceed 2,500 lbs. per M ft. You also have the privilege of letting this lumber remain here as long as you wish, providing that it does not interfere with the necessities of our mill for piling room.

"Very respectfully yours,
                    "A. WEED & Co.
"We accept the above.
                    "THE SOUTH BRANCH LUMBER CO.
                    "B. F. FERGUSON, Treas."

After this contract had been made, and the parties begun to act upon it, and to ship lumber under it to the South Branch Lumber Company, a further agreement was made that the South Branch Lumber Company should take the lower grade of lumber which should be piled in the piles of lumber made under the contract of June 11, and this became a part of the contract.

On September 6 the lumber which had been thus sawed, and which is the lumber in controversy between the complainants and the South Branch Lumber Company, was

delivered into the possession of the defendant the South Branch Lumber Company, and continued in its possession until it was seized by attachment on September 16 and 17. The lumber at this time had been estimated by McClintock. It appears that after the lumber had been estimated, and had been taken possession of by the South Branch Lumber Company, and on September 16, in a suit by the First National Bank of Bessemer against Hoxie & Mellor and A. Weed & Co., the lumber was seized by attachment, and on the 17th of September it was again attached in a suit brought by the complainant the First National Bank of Marquette against Hoxie & Mellor and A. Weed & Co. On the 24th of September the South Branch Lumber Company replevied the lumber from the sheriff, who held it under these writs of attachment.

The defendant the South Branch Lumber Company, upon its contract of purchase of the lumber in controversy from A. Weed & Co., executed and delivered to A. Weed & Co. its negotiable promissory notes to the amount of $58,000. These notes were made and delivered to A. Weed & Co., as follows: About June 21, the sum of $25,000; August 1, $18,000; September 1, $15,000. The first payment was made upon the certificate of the inspector agreed upon in the contract. The last two payments were made without any such certificate or any inventory of Mr. McClintock, that being waived by both parties. All these notes have been paid by the South Branch Lumber Company.

The complainants are the holders of a part of the notes made by A. Weed & Co. and Hoxie & Mellor under the contract of November 28, 1889. All such notes held by the complainants were made after the sale of June 11 by A. Weed & Co. to the South Branch Lumber Company. Some of these notes are renewals of notes made prior to

that date. The complainants bought them in open market for a valuable consideration, and without knowledge of the existence of the bill of sale from A. Weed & Co. to Hoxie & Mellor, heretofore set out, given April 15, 1890. As the holders of these notes, the complainants claim by their bill to be subrogated to all the rights of Hoxie & Mellor under the bill of sale, with the right to foreclose the same as a chattel mortgage given to secure such notes. The issue between the complainants and the South Branch Lumber Company is whether, under the contract of June 11, the South Branch Lumber Company has acquired such rights in the lumber that it could hold the lumber as against the foreclosure by the complainants of the bill of sale of April 15.

Some considerable testimony was given to show what the agreement and understanding was between A. Weed & Co. and Hoxie & Mellor at the time the bill of sale was executed, which, taken with the bill of sale, would constitute a security, and what were the terms. The South Branch Lumber Company contends that when the bill of sale was executed it was the understanding and agreement between A. Weed & Co. and Hoxie & Mellor that A. Weed & Co. should continue in possession of the logs, drive them to their mill at Ramsay, manufacture them into lumber, sell the lumber, and, by means of the proceeds, pay the notes indorsed or signed, and to be indorsed or signed, by Hoxie & Mellor, and that Hoxie & Mellor would continue to indorse and renew notes for A. Weed & Co. to enable A. Weed & Co. to do that business; and that in doing that business A. Weed & Co. made sale of the lumber in question to the defendant by the contract of June 11. It appears that $40,-725 of the notes given by the South Branch Lumber Company was directly applied to the payment of the notes made or guaranteed by Hoxie & Mellor, and by

them given to A. Weed & Co., under their contract of November 28, 1889.

The bill was filed in this cause October 1, 1890, setting up that the complainants were holders of the notes made or guaranteed by Hoxie & Mellor for the accommodation of A. Weed & Co., and that the bill of sale was given for the purpose of securing Hoxie & Mellor against any loss they might suffer by reason of the failure of A. Weed & Co. to pay the promissory notes in accordance with the understanding of the parties, or to secure the several parties and persons by whom the said notes were purchased, and designed that all the property described in and covered by the said bill of sale was to be and form a fund to secure the payment of such notes.

The South Branch Lumber Company filed its answer and cross-bill, denying that the bill of sale was given either to secure Hoxie & Mellor or the notes; setting up the contract of November 28, 1889; alleging that the bill of sale was not intended to interfere with the manufacture of the logs into lumber, and the sale thereof; setting up that the sale to the South Branch Lumber Company by A. Weed & Co. was made with the knowledge and consent of Hoxie & Mellor; that $40,725 of the $58,000 which it had paid under its contract had been applied by A. Weed & Co. to the payment of the notes made by Hoxie & Mellor for the accommodation of A. Weed & Co., and which were outstanding on the date of the making of the bill of sale or given to renew notes then outstanding; setting up that A. Weed & Co., and all the members thereof, were residents of Ashland, in the state of Wisconsin; that the larger part, if not all, of the logs which the parties intended to cover by the bill of sale were in the township of Ironwood, in the county of Gogebic, at the date of the execution and delivery of said bill of sale, to wit, the 15th of April, 1890; that

the bill of sale was never filed in the township where the property was at the date of the execution and delivery thereof; and that the logs out of which the lumber in controversy had been manufactured were not in Black river, near Ramsay, on the date of the execution and delivery of the bill of sale. By way of cross-bill, the South Branch Lumber Company claimed that, the parties being before the court, the rights of all parties should be determined in this cause, and asked to have the further prosecution of the attachment and replevin suits enjoined and the bonds discharged.

For the purpose of showing that the bill of sale was in fact intended as a chattel mortgage, Mr. Mellor, of the firm of Hoxie & Mellor, was called as a witness, and testified that on April 15 there were outstanding notes made or indorsed by Hoxie & Mellor for A. Weed & Co. in the sum of $108,000; that up to that time no security had been given; that this was all accommodation paper, and made for the accommodation of A. Weed & Co. He testified that Paul Weed called upon him at that date, April 15, and wanted to renew this paper when it fell due. He was then asked:

"*Q*. What did you say to that?

"*A*. I said to him that if he wanted to renew any more of that paper we wanted security.

"*Q*. What security did you get?

"*A*. Security on logs at Ramsay.

"*Q*. State what occurred in regard to the giving of the bill of sale, on or about the 15th of April, 1890.

"*A*. Paul Weed came down here to see me about renewing more of that paper, and I told him I was very sorry we had gone into that deal, and I did not want to renew any more without security. He asked me what security we wanted, and I told him we wanted a bill of sale of the logs there at Ramsay. He said, 'All right, you can have it.' I went out in the other room, and got a blank bill of sale, and filled it out, and he signed it, and signed the name of A. Weed & Co.    *    *    *    *

"*Q.* Did this bill of sale contemplate the security of all paper that was outstanding at the time it was given, and any renewals that might be issued of such original paper?

"*A.* That was what the bill of sale was given for. It was for the security of the notes that were outstanding at the time, and any renewals of those notes.

"*Q.* Did you have any conversation with Paul Weed on that point,—about the renewals or securing renewals., etc.?

"*A.* I did have a conversation about that.

"*Q.* What did he say?

"*A.* He said that of course the bill of sale was given to secure any renewals that might be made.

"*Q.* Did you have any conversation with Paul Weed by which it was agreed between you that you were to renew any stated amounts of paper then outstanding?

"*A.* Yes, sir; we had.

"*Q.* State what that conversation was.

"*A.* He said he would probably want to renew most of the paper that was outstanding at that time.

"*Q.* Did you make any agreement with Paul Weed not to file this bill of sale?

"*A.* No, sir."

The witness further testified that he afterwards filed the bill of sale in the town clerk's office in the township of Bessemer, and that, at the time of filing, the logs covered by the bill of sale were in Black river, at Ramsay; that the head of the jam was at the mill at Ramsay, and that he understood the logs were in a solid jam; that A. Weed & Co. were doing business at Ramsay, operating a saw-mill, manufacturing lumber, and were doing a logging business, and that their office was situate at Ramsay, and that they were also doing business at Ashland, Wis.; that after the bill of sale was given they renewed other notes, and some new ones were given, but that they were for renewals, though given for different amounts when they were renewed. The witness also testified to having received a letter from Paul Weed, dated

May 24, 1890, in which Weed wrote him that he inclosed certain notes for renewal, and further stated:

"Please sign or indorse, as the case may be, and send them back to me in inclosed envelope. We do not know yet whether we shall need to renew much in July or not. We expect we sold our Ramsay stock to-day; shall know next week. If we did, it will run into money fast. We send one other note of $3,000, to renew note of same amount due at bank of Antigo, July 21. I hope we shall not have to trouble you much more. Everything running well with us.

"Yours truly,
"PAUL WEED."

The witness further testified that he first learned of the sale made to the South Branch Lumber Company on July 3, which was by letter; that he never authorized the sale, and never had any talk with A. Weed & Co. about it. The witness stated that prior to this time he signed the bond in certain attachment proceedings for A. Weed & Co. to get the logs restored to those parties, and that he expected them to proceed and manufacture the logs and sell the lumber; that they were to take care of the notes as fast as they could sell the lumber off; that, at the time he signed the bond to release the logs from the attachment, A. Weed & Co. had spoken of the South Branch Lumber Company as a possible buyer; and that at that time he entered no protest against A. Weed & Co. making a sale to the South Branch Lumber Company.

The evidence shows that all the notes referred to were thus signed and indorsed by Hoxie & Mellor under the contract of November 28, 1889. Mr. Mellor, in making this contract, understood that the notes referred to therein were to be carried along by renewals of their indorsements until the fall of 1890, and that A. Weed & Co. by their contract agreed to take care of them by

December 31, 1890, and that Hoxie & Mellor were to continue their indorsements until that time. No other arrangements were ever made in regard to these notes. Mr. Mellor also understood that the original agreement provided that A. Weed & Co. were to saw the logs and sell the lumber and take up the notes by that time.

It is evident from this testimony, and the interpretation which Mr. Mellor gave the contract, and his understanding of the arrangement between himself and Paul Weed, acting for A. Weed & Co., that the bill of sale was given to secure the performance by A. Weed & Co. of the contract of November 28, 1889. By the terms of this contract, which was not changed, or understood between the parties to have been changed, in any respect, A. Weed & Co. were to manufacture the logs into lumber, sell the lumber, and out of the proceeds take up the notes before December 31, 1890, and the bill of sale was given to secure Hoxie & Mellor for the faithful performance of this contract; and it is evident that it was the intention of the parties that, so long as A. Weed & Co. went forward and executed the contract, they would not be interferred with by Hoxie & Mellor, but that, should they fail to perform the contract according to these terms, then Hoxie & Mellor would have their remedy under the chattel mortgage to enforce performance. It is difficult to understand from the testimony of Mr. Mellor or of Mr. Paul Weed (which we have not set out here) how it can be claimed that Hoxie & Mellor had a right under this bill of sale—which, by the arrangement between the parties at the time of its execution, was intended and understood as a security—to interfere with A. Weed & Co. in driving these logs to the mill, manufacturing them into lumber, and selling and disposing of the lumber for the purpose of taking care of these

89 MICH.—24.

notes or renewals, when it must be conceded that they were to have until December 31, 1890, to 'pay and take up such notes, and the renewals thereof by Hoxie & Mellor, who were to carry them along upon such renewals until that time. By the terms of the contract of November 28, 1889, A. Weed & Co. were to have until that time to pay and take up these notes. No change was made in that contract, and, by the testimony of Mr. Mellor himself, the chattel mortgage, into which the bill of sale was converted by parol agreement, was only intended to secure the performance of this contract. By the arrangement, then, between Hoxie & Mellor and A. Weed & Co., they were to have the right to manufacture and sell this lumber for the very purpose of meeting these notes. In this view of the case, A. Weed & Co. had the right to sell and convey on June 11, 1890, all of the lumber manufactured at their mill from these logs to the South Branch Lumber Company, and the claim of the South Branch Lumber Company would have priority over any claim which Hoxie & Mellor had under the bill of sale, or any claim which the complainants might have as the holders of these notes by way of subrogation. There is nothing upon the record to show that the South Branch Lumber Company had any notice or knowledge of the bill of sale held by Hoxie & Mellor. The only claim of notice to the South Branch Lumber Company is that the bill of sale was filed in the township of Bessemer, Gogebic county. It was executed on April 15 and filed May 10, 1890. A. Weed & Co. were non-residents of this State.

The question of the place of filing the mortgage does not become important in determining the rights of the South Branch Lumber Company. But in determining the rights of the defendant the First National Bank of

Ashland, Wis., it does become important. About September 6, 1890, the firm of Hoxie & Mellor failed, and made an assignment for the benefit of creditors, Charles V. Bardeen, one of the defendants herein, being assignee. About the same time A. Weed & Co. became insolvent. On September 15, 1890, A. Weed & Co. assigned their contract with the South Branch Lumber Company to the First National Bank of Ashland, as security for notes to the amount of $56,130, held by said bank, including $41,130 of the said accommodation notes, the said bank to pay said indebtedness, and the surplus, if any, to A. Weed & Co., after paying expense of carrying out the contract. The First National Bank of Ashland held $41,130 of the said accommodation paper, $9,625 of which was discounted by said bank, May 3, 1890, and the remainder at sundry times from May 31 to August 13, 1890. On September 15, 1890, A. Weed & Co., also executed and delivered to the First National Bank of Ashland a chattel mortgage to secure said notes, amounting to $56,130, covering the logs and lumber in question, besides other property. At the same time other mortgages and securities were turned out to said bank, but not sufficient in value to cover the indebtedness.

The amount of the accommodation paper now outstanding and held by parties to this action is $86,232.50, some of which are renewal notes, the balance being notes discounted and the money used in whole or in part to pay up old notes. The First National Bank of Ashland paid out in the sawing and taking care of the property and carrying out the contract with the South Branch Lumber Company, after it took possession under its assignment of contract and chattel mortgage, the sum of $11,804.11, and for taxes on the lumber $456.92.

The particular parts of the decree to which the First

National Bank of Ashland excepts are those which
find:

"That the lien of said bill of sale is prior to the lien
of the said First National Bank of Ashland created by
its said chattel mortgage, dated September 15, 1890.   *
*   *   *   *   *   *   *   *   *   *   *   *  ·  *   *

"That the said First National Bank of Ashland, the
First National Bank of Bessemer, and the complainants
herein, excepting the First National Bank of Appleton,
are entitled to share *pro rata* (provided, however, that
the said First National Bank of Ashland shall first
exhaust its other security obtained by it as security for
the said notes and other demands) in the surplus that
shall remain after satisfying the said sum so ascertained
to be due to said bank as aforesaid, and for which it
has a first lien; and that they shall so share to the
amount and extent only of the notes, respectively, held
by them, and secured by said bill of sale of April 15,
1890, namely, notes then outstanding, signed or indorsed
by Hoxie & Mellor for the accommodation of said A.
Weed & Co., and renewals of said notes."

The court having found that the bill of sale from A.
Weed & Co. to Hoxie & Mellor was never recorded in
Ironwood township, where the logs therein intended to
be described were situated, and that the contract of the
South Branch Lumber Company is prior to the lien of
said bill of sale, the First National Bank of Ashland con-
tends that it was error in the court to hold that the
lien of the bill of sale is prior to the lien of the First
National Bank of Ashland.

It is urged on behalf of defendants that the bill of
sale was void as to third parties, because the description
did not cover the property intended to be conveyed, the
bill of sale calling for logs "in the Black river, near
Ramsay," while a large portion of the logs in question
were not in the river, but in roll-ways on the banks of
the river, and six miles from Ramsay. It is also con-
tended that the mortgage was void as to the First

National Bank of Ashland, for the reason that it was
not filed in the proper town clerk's office. It is conceded
that the mortgage was never filed in the town clerk's
office where the logs were situate at the time the bill of
sale was executed and delivered; that is, in the town-
ship of Ironwood. But counsel for complainants claim
that the mortgage having been filed in the town clerk's
office of the town of Bessemer, and the logs having
been floated into that township, and being in that town
at the time the mortgage was filed, such filing was proper.

Section 6193, How. Stat., provides:

"Except when the mortgagor is a non-resident of the
State, when the mortgage, or a true copy thereof, shall
be filed in the office of the township clerk of the town-
ship, or city clerk of the city, or city recorder of
cities having no officer known as 'city clerk,' where the
property is."

The same section requires chattel mortgages made by
residents to be filed in the townships where the mort-
gagors reside. Under this statute there is but one
place for the filing of a chattel mortgage when the mort-
gagor is a non-resident of the State, and that is the
township or city where the property is, and the filing
would not be constructive notice unless so filed. It is
plain that it is the intent of the statute that the filing
should be in the township or city where the property is
at the time of the execution and delivery of the mort-
gage, and not in some other township or city to which
the property may be removed after such execution and
delivery. It was the intent of the Legislature to fix a
rule by which all mortgages should be filed, and by
which all must be governed. This precise question has
never, until the present occasion, been before this Court.
In many of the states it is provided by statute that, in
case of non-resident mortgagors, the filing shall be in
the township or village "where the property may be at

the time the mortgage is executed." The statute of Massachusetts formerly provided that a chattel mortgage should be recorded where the mortgagor resided "at the time of making the same." By a revision of the statute, the words, "at the time of making the same," were omitted. In *Witham v. Butterfield*, 6 Cush. 217, the court of Massachusetts, speaking of this omission in the revision, said:

"This latter clause has been stricken out in the revised statutes. Whether this was done for precision merely, or was intended to change the law in a material point, is left wholly in doubt, and has rendered that uncertain which was before certain."

The point was not decided; but the court, even when the statute had been changed, was doubtful if it were not done simply for precision. Under our statute no such doubt can arise. This statute has been carried upon the statute books for a great many years, and no one has ever doubted that the time of the execution and delivery of the mortgage fixes and determines the place where such mortgage must be filed.

We need not discuss the other questions raised by counsel, as this must be decisive of the rights of the complainants and the First National Bank of Ashland. The bank and its officers had no actual knowledge of the execution of this bill of sale, which we have denominated the chattel mortgage, and the filing in the township of Bessemer cannot be construed as constructive notice.

The order and decree of the court below were substantially:

1. That the bill of sale was given to secure the payment of the notes, and all renewals thereof, but that it was not valid as against the South Branch Lumber Company, because not filed in Ironwood township, where the logs were at the date it was given, but not at the date it was filed.

2. That the contract between the South Branch Lumber Company and A. Weed & Co., of June 11, 1890, was an executory contract for the purchase of lumber, upon which the South Branch Lumber Company had advanced $58,000.

3. That the lien of the bill of sale is prior to the mortgage to the First National Bank of Ashland.

4. That the First National Bank of Ashland is entitled to be reimbursed to the amount of $11,000, for money expended in protecting and manufacturing the lumber, and a reference is ordered to ascertain whether it is entitled to more.

5. That the First National Bank of Ashland, the First National Bank of Bessemer, the Security Savings Bank of Ashland, and the complainants are entitled to share *pro rata* in the security, after the First National Bank of Ashland shall exhaust its other security, except that the First National Bank of Appleton is not entitled to participate.

6. That a receiver be appointed, that the lumber be sold, and that the contract with the South Branch Lumber Company be carried out, and that the receiver settle with the South Branch Lumber Company therefor.

7. That a reference be made to ascertain the damages to the South Branch Lumber Company on account of this injunction.

The South Branch Lumber Company is entitled to hold all that its contract called for with A. Weed & Co., and is in no manner affected by the bill of sale of complainants, or any claim which the First National Bank may assert. The First National Bank of Ashland, after that, is entitled to have its claim allowed for moneys· advanced in carrying on the business of A. Weed & Co.; and its claim under its chattel mortgage is held prior to any claim which the complainants may assert under the bill of sale to Hoxie & Mellor. The appointment of a receiver is confirmed, and he shall settle with the parties from the proceeds of the sales in accordance with this opinion. The South Branch Lumber Company will recover its costs against complainants.

The First National Bank of Ashland will also recover its costs against the complainants.

. The decree of the court below must be modified in accordance with this opinion.

CHAMPLIN, C. J., MORSE and McGRATH, JJ., concurred. GRANT, J., did not sit.