PINCH *v.* WILLARD.

1. BILL OF SALE—CHATTEL MORTGAGE—PAROL EVIDENCE.
     A bill of sale absolute on its face may, in an action at law, be shown by parol to have been given as security.

2. SAME—TRANSFER BY ASSIGNMENT.
     A bill of sale given merely for the accommodation of the vendor, and assigned by his direction to secure a loan to himself, will be treated as a chattel mortgage from the vendor to the assignee.

3. USURY—RIGHT OF RECOVERY.
     Usurious payments cannot be recovered.

4. SET-OFF—REPLEVIN.
     Set-off is wholly statutory, and has never been authorized in actions of tort. It cannot, therefore, be allowed in an action of replevin.

5. SAME—CHATTEL MORTGAGE—SEPARATE CLAIMS.
     An agreement that security given for a present loan shall also be held by the lender as security for any balance due him on previous transactions is not equivalent to an agreement that, if a balance is found to be due the borrower on such transactions, the same shall be applied in reduction of the present loan.

Error to Eaton; Smith, J. Submitted December 4, 1895. Decided January 16, 1896.

Replevin by Benjamin W. Pinch against Aaron H. Willard. From a money judgment in his favor as for a lien upon the property, plaintiff brings error. Reversed.

*Huggett & Smith,* for appellant.

*Powers & Stine,* for appellee.

HOOKER, J. The parties to this action settled accounts upon May 15, 1890, and found the sum of $1,853.48 due from the defendant to the plaintiff. The sum of $1,500 was thereupon paid, leaving a balance of $353.48. It

should be added that the defendant claims that this included some usurious items, *i. e.*, that such were included in the settlement. The amount of these does not appear. A chattel mortgage covering the property in controversy (excepting the horses) was given to plaintiff at this time. The plaintiff claims, and there was evidence tending to show, that their dealings continued until November 30, 1892, when they ceased, and that there was no settlement after May 15, 1890; that, through such dealing, the defendant became indebted to the plaintiff on various other obligations, some of them providing for bonuses of from $5 to $10 per month, in addition to legal interest, and that he paid to plaintiff large sums of money at different times. Upon these transactions the plaintiff claims that a balance was due to him.

The defendant was also indebted to one Downs in a large amount, which was secured by a mortgage upon a large number of horses, including those in dispute. On October 18, 1892, the defendant executed and delivered to William J. Hickok a bill of sale, of which the following is a copy:

"OLIVET, Mich., Oct. 18, '92.
"I have this day sold to W. J. Hickok twenty-one head of horse stock, mares, colts, and fillies, as I may wish to select from my stud of horses. Description of said stock is not given, and only possession of stock is given, and right and title to said stock guaranteed to be perfect. Consideration of this sale is one thousand dollars. Received payment of two hundred and fifty dollars as forfeit; balance to be paid in the month of November (next), and said amount, $750, to be paid into the hands of James T. Downs or his agent.
"A. H. WILLARD."

At the same time, Hickok was directed to take $250 from a sum of money in his possession, belonging to the defendant, and pay it to Downs, which Hickok did. It seems to have been contemplated that Hickok should obtain a release from Downs of the property covered by the bill of sale, and the record contains evidence that he did

so in writing, and Hickok testifies that it was conditioned upon payment of $750 additional during November, 1892. Whether Hickok promised Downs to pay is not shown; and the only evidence of a promise to pay is contained in the bill of sale, which does not bear his signature. Hickok testified that he expected Willard would pay it, and that he never made any payment upon the bill of sale. He testified also that he understood that, if he did pay the $750, the property should be his absolutely. It may be claimed that this was afterwards modified by the statement that "there was no condition by which I was to hold it in the nature of a mortgage or lien upon the horses to secure my debt if I paid the money, *unless I saw fit.*" He does not appear to have claimed any interest in the property, and, in speaking of the bill of sale, says: "I had a paper that claimed to be *a bill of sale in my possession.*" And he says that "it was not my idea that he was to furnish the stock as security for the $750 and the old debt he owed me."

We are unable to find in the record any evidence of payment or promise by Hickok, unless the taking and holding of this writing implied one. When we view this in the light of surrounding circumstances, we doubt the intention of the parties to make any contract in relation to the matter, and are more inclined to think that Hickok was accommodating and acting for Willard, as Willard testifies. Hickok says:

" I wasn't present when the horses were selected, but from Mr. Downs' conversation afterwards I supposed he understood it. I supposed that they were selected out so that Mr. Downs would know upon what horses the mortgage remained, and I supposed Mr. Downs supposed I had bought them. So far as I know, *Mr. Downs didn't know* but that I had bought them right out from *his conversation* which I had with him afterwards. I should say this was done at the request of Mr. Willard, and in his interest, and that this arrangement was made at Mr. Willard's request, although I had a little interest. Mr. Willard was owing me a little about sawing, and I

was to receive some of my pay. I made this arrange-
ment with him. I attended to this business for him un-
der those circumstances, that I was to receive my pay. I
have received it in part.

"*Q.* Was there any understanding between you and
Mr. Willard that you were to have this stock as security
provided you paid the additional $750 mentioned in the
bill of sale? Was there any talk about that?

"*A.* Not as security, sir.

"*Q.* Was there any talk about his securing you for
money he then owed you before this paper was made?

"*A.* Why, no difference. There was no particular se-
curity. I expected Mr. Willard would furnish the $750 *to
go to Mr. Downs on or before the 30th day of November.*
That was the understanding when the paper was made.
However, there was a little talk that *possibly I might
pay it.* There was nothing definite in relation to it. It
was not my idea that he was to furnish the stock as secur-
ity for the $750 and the old debt he owed me. I saw the
stock on Mr. Deringer's farm. I supposed Mr. Willard
paid the pasturage. I did not pay any. Mr. Willard
*directed me to make the assignment* to Mr. Pinch. The
horses were not upon my farm anywhere. I furnished
them no feed in any way. I don't think there was any
agreement between me and Mr. Willard *that I was to be
owner of the property in any different way from what
I have told.* I acted under Mr. Willard's direction. In
all the transactions I acted largely under his direction. I
was not a loser in any way in the matter in case the $750
was not paid to Mr. Downs."

But, whatever may be thought about this, the parties,
Hickok and Willard, did not carry out any arrangement
in the nature of a sale. Hickok paid nothing; Willard
delivered nothing; and, at Willard's direction, Hickok
subsequently assigned his interest to Pinch, and received
money from Pinch for Willard, and delivered it to Downs.
That came about in this way: Some time in November,
Willard asked Pinch to loan him $750, to pay Downs,
offering to have Hickok assign this bill of sale to Pinch,
if he would do so, and to pay him interest on the loan.
Pinch agreed to do this, and it ran along until the last of
the month, when Pinch refused, unless Willard would

give him a deed of certain land, and make such deed and the property covered by the bill of sale security for the other debts claimed by him to be owing to him from Willard, together with the $750 to be advanced. Willard declined to do that, but at the last moment they reached some sort of understanding, and the money was paid, and assignment of the writing was made by Hickok, as stated. The parties disagree about this arrangement. Willard claims that the money was borrowed, and the bill of sale assigned by way of security, while Pinch claims that he paid the money and took the assignment on the promise of Willard that he would come the next day, or soon thereafter, and execute a contract and note for all the money owing, which should be secured as hereinbefore stated. He claims that Willard did not do this, and, therefore, that he had a right to stand upon his purchase of the horses for $750, through the Hickok bill of sale, which gave him an absolute title to them. Pinch testifies that he bought these horses of Hickok at Willard's request, to prevent Downs from taking them on his mortgage; that he understood that Hickok refused to pay any more money on them; that he did not know that Hickok did not own the horses, but surmised how the thing was. He said that, at the time he took the bill of sale, a verbal agreement was made, to be reduced to writing. Willard was to see Pinch on the next day, and make a complete settlement of all their dealings, mortgages, and accounts, and make a written contract to secure, with security upon 80 acres of land and 20 head of horses. That was to take the place of the old indebtedness, and secure this $750.

Upon this verbal contract, which was never put in writing, this money was paid and bill of sale assigned. The plaintiff does not show that there was an express agreement that he should buy these horses. It is plain that it was not expected that they should extinguish any claim he might have for the $750, which it is evident was to be considered a loan, upon which he was to receive interest, and for which the horses were to be held as secur-

ity.   Upon the facts, the court was clearly right in saying
that this bill of sale was given by Willard to Pinch as
security.   It was as though he had made a new bill of
sale on payment of $750, and we fail to see how the fact
that the instrument was assigned to Pinch at Willard's
direction places the parties in any different relation to
each other.   That a bill of sale may be shown in a court
of law to have been given for security is established by
several cases cited by counsel.   *Fuller* v. *Parrish*, 3
Mich. 211; *Picard* v. *McCormick*, 11 Mich. 68; *Cooper*
v. *Brock*, 41 Mich. 488; *Seligman* v. *Ten Eyck's Estate*,
74 Mich. 525; *Weed* v. *Mirick*, 62 Mich. 414.   Counsel
argue that, conceding this, "the cases have never gone
further than to hold that a defeasance in such case may
rest in parol; that no case holds that such proof may be
introduced to show that the bill was not intended as a bill
of sale,—that the title was not conveyed thereby."   We
think this an overnice distinction.   Our understanding of
the rule is that a bill of sale, absolute upon its face, may
be shown by parol to have been given under circumstances
that indicate that it was intended as security for a debt,
and not a sale of the chattels; and we know of no case
that holds that such an instrument is an exception to the
rule that title does not pass under a mortgage.   That such
is the rule, see *Lucking* v. *Wesson*, 25 Mich. 443, over-
ruling *Tannahill* v. *Tuttle*, 3 Mich. 104, *Thurber* v.
*Jewett*, Id. 295, and *Flanders* v. *Chamberlain*, 24 Mich.
305.   See, also, *Kohl* v. *Lynn*, 34 Mich. 360; *People* v.
*Bristol*, 35 Mich. 28; *Gardner* v. *Matteson*, 38 Mich.
200; *Haynes* v. *Leppig*, 40 Mich. 602; *Brink* v. *Freoff*,
Id. 611; *Wilson* v. *Montague*, 57 Mich. 638; *First
National Bank* v. *Weed*, 89 Mich. 357.   If there is any
good reason why a bill of sale, absolute in form, but
which the law holds in fact a security in the nature of a
chattel mortgage, not intended to transfer property, but
as a security merely, should be held to convey title, it has
not been suggested.

108 MICH.—14.

The court evidently treated this transaction as a bill of sale given, not only to cover the $750 debt, but all other obligations, for he permitted the parties to go at length into their accounts subsequent to May 15th. He directed the jury to strike a balance, and give the plaintiff a verdict if they found anything due to him. This was in accord with the plaintiff's claim that he was to be secured on the horses and land for all indebtedness. Counsel for the plaintiff insist that the court should have treated the chattel mortgage and bill of sale as two distinct claims. This is true so far as to have authorized a verdict of not guilty as to the property covered by the mortgage, if the jury should find the debt of $353.48 paid up, for there appears to be no claim that this mortgage secured the $750 item. But the plaintiff suffered no injury by this omission. As the jury found a balance of only $239.63, it is evident that they found that this property was discharged by payment of the debt.

In this connection we will consider the assignment of error upon the instruction in relation to usury. The transaction in question took place November 30th, and there were no dealings between the parties afterwards. Counsel urge that the plaintiff should have recovered the amount of money loaned at that time—*i. e.*, $750—at the least, and that such sum could not lawfully be reduced by bonuses. It is manifest that it was so reduced, or that the jury must be supposed to have found a balance against the plaintiff, in which bonuses could not be included. In other words, they argue that if the defendant did not owe anything on November 30th, previous to the $750 deal, the question of bonus could not be considered, as, where usury has been paid, it is not recoverable; and such we understand to be the law. It seems self-evident that the jury must have found that payments, with or without unpaid bonuses, equaled all previous obligations; and it is obvious that nothing in the nature of a bonus or a promise to pay usury could be applied upon the $750

debt. It follows that, if the same was not reduced by usury already paid, it must have been reduced by an offset consisting of a previously existing balance against the plaintiff. The plaintiff unquestionably held the horses as security for $750. Nothing had been paid upon this obligation, and he had a right to enforce it. If, at the time the $750 was obtained, the defendant owed plaintiff nothing, then these horses would be security for only $750. The fact that the parties supposed that something was due to the plaintiff, and agreed that it should be secured by the horses, was not equivalent to an agreement that if it was found otherwise, and that the balance was in favor of the defendant, such balance might be applied upon the $750 debt by way of offset, as appears to have been done. This was erroneous, unless it is proper to prove offsets in actions of replevin. As we have frequently had occasion to say, set-off is a creature of the statute, and it has never been authorized in actions of tort. For authorities holding that accounts cannot be adjusted or settled in an action of replevin, see *Whitworth* v. *Thomas*, 83 Ala. 308 (3 Am. St. Rep. 725); *Otter* v. *Williams*, 21 Ill. 120; *Streeter* v. *Streeter*, 43 Ill. 155; Wat. Set-Off, 169; *Fairman* v. *Fluck*, 5 Watts, 516; *Peterson* v. *Haight*, 3 Whart. 150. See, also, *Dole* v. *McGraw*, 71 Mich. 110.

Under the proofs, the jury could not legitimately find a verdict of not guilty, as the court instructed them they might do. True, they did not, but, under this instruction, they found an opportunity to render a much smaller verdict than the undisputed testimony shows that the plaintiff was entitled to. The objectionable feature in the charge is as follows:

"And if you find a proper demand of the property was made by the plaintiff before the commencement of this suit, your verdict must be for the plaintiff, unless you find that there is nothing due the plaintiff,—was nothing due to the plaintiff at the time of the commencement of this suit. And upon the amount covered by the bill of sale or contract of November 30, 1892, you would compute simple interest thereon from the time of the payment of the same

to Mr. Hickok, which was on the 30th day of November, 1892. And, in determining the question of payment, you are to take into account the whole dealings between the parties, and as proven in the case; that is to say, you are to ascertain what amount of money Mr. Pinch has let Mr. Willard have, and what amount he has received back, not taking into account the bonuses or unlawful interest, which will be explained to you further on. And if, upon striking the balance, you find that Pinch has been paid in full, your verdict should be not guilty; but, if you find that Mr. Pinch has not been paid in full, you are then to determine what amount remains unpaid, and state the amount in your verdict."

The judgment must therefore be reversed, and a new trial ordered.

LONG, GRANT, and MONTGOMERY, JJ., concurred. McGRATH, C. J., took no part in the decision.